IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

UNITED STATES OF AMERICA    *
                            *
        v.                  *    CR 417-256
                            *
ROBERT ANTHONY MOODY        *

---

### O R D E R

---

Defendant Robert Anthony Moody has pled guilty to one count of receipt of child pornography in violation of 18 U.S.C. § 2252(a)(2) and § 2252A(b)(1). On October 10, 2017, a search warrant was executed at Defendant's home in Savannah, Georgia. A forensic analysis of Defendant's laptop computer yielded a total of 215 videos containing child pornography, some as short as one minute and some as lengthy as an hour. The videos depicted graphic images of child pornography involving children between the ages of 2 and 12. The Government notified seven alleged victims that their images were among those received and possessed by this Defendant.

On May 18, 2018, Defendant was sentenced to 151 months in custody followed by 25 years of supervised release. The Court took the issue of victim restitution under advisement. The Court has now considered the applicable law and the information provided in the Presentence Investigation Report and the Victim Impact Statements. The Court now enters its findings respecting restitution as follows.

## I.  Applicable Common Legal Standards

Pursuant to 18 U.S.C. § 2259, the Court "shall order restitution for any offense under [Chapter 110]" and "shall direct the defendant to pay the victim . . . the full amount of the victim's losses."[1] 18 U.S.C. § 2259.  "The issuance of a restitution order under this section is mandatory." Id. § 2259(b)(4)(A).  The "full amount of the victim's losses" includes:

> (A) medical services relating to physical, psychiatric, or psychological care;
>
> (B) physical and occupational therapy or rehabilitation;
>
> (C) necessary transportation, temporary housing, and child care expenses;
>
> (D) lost income;
>
> (E) attorneys' fees, as well as other costs incurred; and
>
> (F) any other losses suffered by the victim as a proximate result of the offense.

Id. § 2259(b)(3)(A-F).

Restitution orders under § 2259 are governed by 18 U.S.C. § 3664 and 18 U.S.C. § 3663A.  See 18 U.S.C. § 2259(b)(2). The Government has the burden of proving the amount of the victim's losses by a preponderance of the evidence, and the Court may apportion liability if it finds that more than one defendant has contributed to the victim's loss.  Id. § 3664(e)

---

[1]  Defendant was convicted of an offense that is within the scope of Chapter 110 offenses.

(h). Finally, the Court cannot refuse to order restitution due to the defendant's economic circumstances or because the victim may be entitled to compensation from insurance or any other source. Id. § 2259(b)(4)(B).

The United States Supreme Court has provided an analytical framework for determining an appropriate restitution amount in Paroline v. United States, 572 U.S. 464, 134 S. Ct. 1710 (2014). Nevertheless, the Paroline Court recognized that the calculation of restitution "cannot be a precise mathematical inquiry and involves the use of discretion and sound judgment." Id. at 1728. The Eleventh Circuit has not employed the Paroline analysis, but district courts across the country have been, albeit not harmoniously. This Court has examined the opinions of other courts for persuasive and anecdotal guidance. The Paroline Court providently noted that its approach would not be "without its difficulties."[2] Id. at 1729.

Importantly, the Paroline Court held: "Restitution is . . . proper under § 2259 only to the extent the defendant's offense proximately caused a victim's losses." Id. at 1722. Thus, in child pornography cases,

---

[2] See United States v. DiLeo, 58 F. Supp. 3d 239, 244-45 (E.D.N.Y. 2014) (noting that the task of applying the causal standard in Paroline "seems akin to piloting a small craft to safe harbor in a Nor'easter")

> where it can be shown both that a defendant possessed a victim's images and that a victim has outstanding losses caused by the continuing traffic in those images[,] but where it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry, a court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses.

Id. at 1727.

To that end, the Paroline Court suggested that a district court start with a determination of the amount of the victim's losses caused by the continuing traffic in the victim's images. Id. at 1728. Then, the award of restitution is set upon consideration of factors "that bear on the relative causal significance of the defendant's conduct in producing those losses." Id. The Supreme Court named the following factors:

(1)  the number of past criminal defendants found to have contributed to the victim's general losses;

(2)  reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses;

(3)  any available and reasonably reliable estimate of the broader number of offenders involved (most of whom may never be caught or convicted);

(4)  whether the defendant reproduced or distributed images of the victim;

(5)  whether the defendant had any connection to the initial production of the images;

(6)  how many images of the victim the defendant possessed; and

4

> (7)   other facts relevant to the defendant's relative
> causal role.

Id.   Thus, "[a]t a general level of abstraction," under
Paroline, "a court must assess as best it can from available
evidence the significance of the individual defendant's
conduct in light of the broader causal process that produced
the victim's losses."   Id. at 1727-28.


## II.  Analysis

A.  General Victimization

The Eleventh Circuit has compared possessors of child
pornography to producers and distributors of child
pornography, noting that they all "victimize the children
depicted within."   United States v. McDaniel, 631 F.3d 1204,
1208 (11th Cir. 2011).   More specifically, with regard to
possessors or "end users," the Eleventh Circuit held that they
"enable and support the continued production of child
pornography" and "violate the child's privacy by possessing
their image."   Id.

The Fifth Circuit similarly characterized end users in
United States v. Norris, 159 F.3d 926, 929-31 (5th Cir. 1998).
The Norris court held that consumers of child pornography harm
the children depicted in at least three distinct ways.

> *First*, the simple fact that the images have
> been disseminated perpetuates the abuse initiated
> by the producer of the materials. . . . The

5

consumer who "merely" or "passively" receives or possesses child pornography directly contributes to this continuing victimization.

*Second*, the mere existence of child pornography represents an invasion of the privacy of the child depicted. . . . The recipient of child pornography obviously perpetuates the existence of the images received, and therefore the recipient may be considered to be invading the privacy of the children depicted, directly victimizing these children.

*Third*, the consumer of child pornography instigates the original production of child pornography by providing an economic motive for creating and distributing the materials.

Id. Or, as more succinctly put by the United States Supreme Court, "every viewing of child pornography is a repetition of the victim's abuse." Paroline, 134 S. Ct. at 1727.

In this case, the Government represents that Defendant received and possessed images of child pornography depicting each of the seven victims. Moreover, the victim impact statements submitted either by or on behalf of the victims amply demonstrate that they are victims of Defendant's crime.

B.   Individual Victimization

1.   *Sarah*

Sarah is one of four known victims depicted in the child pornography series entitled "Marineland." Sarah was sexually molested as a child over a six to seven-year period by her natural father. Her abuser purposefully took pictures and videos to "share" with others on the Internet. Through

counsel, Sarah has requested restitution in the amount of $15,000. Sarah's request is accompanied by her own statement, extensive documentation of her losses (including expert reports of her psychological injury and loss of income), and a declaration of counsel regarding attorney's fees and costs.

In Sarah's own words: "Every time someone else sees pictures or videos of me it feels like they are the ones who hurt me to begin with." In 2014, a clinical psychologist reported that Sarah's psychological problems stem primarily from a daily fear that she will be found and harassed by current child pornography consumers. Sarah has an agoraphobic inability to leave her home unless she is with a trusted companion. She is unable to work outside of her house; a vocational expert deemed her unemployable without obtaining therapy to address her functional deficits. Sarah also suffers from fibromyalgia exacerbated by stress.

As Paroline dictates, the Court first starts with Sarah's claimed losses. Sarah claims general losses in the amount of $2,753,421.77. This includes costs for psychological counseling of $448,552.00; lost income of $2,273,436.00; and out-of-pocket costs and expenses of $31,433.77 incurred relative to restitution documentation.

The Court now turns to the Paroline factors. Unfortunately, information pertaining to these factors is very

limited. Sarah's counsel submits that 494 orders of restitution have been entered for Sarah, though no information has been provided summarizing the amount of these orders.[3] Moreover, there is no way to predict the number of future offenders likely to be caught, convicted and ordered to pay restitution.[4] Neither counsel nor the Government venture an estimate on this number, and the Court has no basis for venturing its own guess. And, while this seems troubling, the Court notes that no other district court has been able to ascertain this number.[5] More troubling in this case is the lack of any evidence on the issue of how many images of Sarah Defendant possessed. Nevertheless, the knowledge that

---

[3] Sarah has received $241,658.67 in restitution to date.

[4] One court remarked that the "Marineland" series is one of the most widely distributed child pornography series in the world. United States v. Anchak, 2017 WL 445592, at *2 (E.D. Mich. Feb. 2, 2017). Its proliferation is evidenced by the fact that at the time of fashioning restitution in Anchak, the district court had been informed that Sarah had 172 orders of restitution as opposed to the 494 she has now. Thus, the Court must assume that there will be future offenders ordered to pay restitution.

[5] The district court in United States v. Romero-Medrano, 2017 WL 5177647 (S.D. Tex. Nov. 18, 2017), stated that it would be "irresponsible" to guess at the total number of future offenders. Id. at *4 (quoting DiLeo, 58 F. Supp. 3d at 245 ("[I]t is hard to fathom how, at any given point in time, such estimates and predictions could be more than a wild guess."); United States v. Watkins, 2014 WL 3966381, at *7 (E.D. Cal. Aug. 13, 2014) (to double the number of known offenders or otherwise increase the divisor to account for future offenders would be arbitrary, "impermissible," and "near triviality").

Defendant has seen even one image or video of Sarah causes some measure of harm to her. Finally, and not unimportantly, there is no evidence that Defendant reproduced or distributed images of Sarah[6] or that he had any connection to the initial production of the images.

In sum, the Court is left only with a claimed loss of over $2 million to be borne by 494 other defendants and an unknown number of future offenders. From this information, it is impossible to accurately determine proportional restitution because not only is the universe of offenders unknown, but the Court has no information about the true extent of this Defendant's involvement with this victim's images. One aspect of the case remains unassailable however: Sarah has suffered and will continue to suffer significant psychological harm because of the continued distribution of these images.

The Court considered another case involving a Marineland victim, who could very well be Sarah by the victim's description. In <u>United States v. Schultz</u>, 2015 WL 5972421 (D. Mass. Oct. 14, 2015), the victim was awarded $26,500 in restitution for 30 images in the defendant's possession. The court noted therein that the Marineland victim had been

---

[6] The Court notes that while Defendant was originally indicted on a count of distributing child pornography, that count was dismissed pursuant to his plea agreement, and there is no evidence of relevant conduct relating to this particular victim.

awarded a range of $250 to $51,500 in prior cases. Id. at *2. Thus, the average restitution was $4,599.97, the median was $3000, and the most frequent award was $3000. Id. In United States v. Romero-Medrano, 2017 WL 5177647 (S.D. Tex. Nov. 18, 2017), the district court was similarly bereft of empirical data. Nevertheless, going with what was given to it, the court divided the claimed amount of total loss by the number of prior restitution orders and awarded Sarah $7,170.37.[7] Id. at *6. The court reduced that amount by 10% to account for future offenders. The court reduced the amount by another 10% because the defendant was not the initial abuser. However, the court applied a 10% increase to the award because the defendant had distributed Sarah's image. Thus, in Romero-Medrano, the court awarded Sarah $6,453.33 (90% of the divided amount). Id.

In this case, the Court will begin with the known numbers. Sarah's claimed loss amount of $2,753,421.77 divided by now 495 offenders = $5562.47. The Court will discount this amount because of the obvious proliferation of the Marineland series, Defendant's limited role as an end-user, and the lack of evidence on the number of images involving Sarah in this case. Upon consideration, therefore, the Court will award

---

[7] At the time, Sarah has a total claimed loss of $2,753,421.77 and prior orders of 383 (plus the defendant - 384), which produces the result of $7,170.37.

Sarah $3300 in restitution.[8]  This award is commensurate with the reported median of prior awards in the Schultz case.

Before moving to the next victim, the Court is constrained to note that its sister court in Florida denied restitution to Sarah on virtually the same evidence as is presented on her behalf here.  See United States v. Hanlon, 2015 WL 310542 (M.D. Fla. Jan. 23, 2015).  In doing so, the Hanlon court relied upon United States v. McGarity, 669 F.3d 1218 (11th Cir. 2012).  In McGarity, which was decided before Paroline, the Eleventh Circuit held that a § 2259 restitution order is only appropriate where the Government can demonstrate that the victim suffered harm caused by the *particular* defendant's actions.  Thus, the Hanlon court, while acknowledging Paroline, determined that the Government had not established that the defendant caused any harm to Sarah because Sarah had no knowledge of the defendant or his single distribution of her image until she was informed by the attorney of the pending criminal case.  Hanlon, 2015 WL 310542, at *5.

In this Court's estimation, the Hanlon court did not read Paroline correctly.  The Paroline Court understood that victims of child pornography can often prove aggregate losses, but cannot prove losses "that are the proximate result of the

---

[8]  The Court's discount is approximately 40%.

11

offense conduct of a particular defendant who is one of thousands who have possessed and will in the future possess the victim's images but who has no other connection to the victim." Paroline, 134 S. Ct. at 1722. The Court instead developed an approach which recognizes that a possessor of child pornography is "part of the overall phenomenon that caused [a victim's] general losses" and should be made to pay restitution "in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses." Id. at 1726-27. Thus, the Hanlon court's adherence to a standard of proof that requires evidence of a causal link between the victim's losses and a *particular* defendant's conduct was erroneous. See also United States v. Dillard, 891 F.3d 151, 159-60 (4th Cir. 2018) (reversing a district court's denial of restitution because of its misunderstanding that Paroline requires proof of a connection between a victim's harm and a particular defendant; stating that Paroline "expressly disavowed any such requirement").

　　2. *Violet*

Violet is one of the victims depicted in the child pornography series entitled "At School." Violet was repeatedly sexually molested as a child between the ages of four and eight. Her abuser purposefully took pictures and

videos to "share" with others on the Internet. Violet is still a minor and not yet of an age to truly understand the wide-reaching effects of the spread of her images online. Through counsel, Violet has requested restitution in the amount of $10,000. Violet's request is accompanied by her parent's impact statement, reports of forensic psychological and medical examinations, and a declaration of counsel regarding attorney's fees and costs.

According to Violet's parents, she has been given a "lifelong sentence of abuse and exploitation." At the time of her parent's statement in September 2016, Violet had not yet learned of the proliferation of the pornographic images. Violet's parents feared for her future well-being, particularly because Violet would be unable to control the circulation of the images. Violet's parents felt helpless. The reports of two experts show that Violet will more likely than not suffer a number of complications including depression, anxiety, disruptive behaviors, eating disorders, sleep dysfunction, a non-delusional paranoia, and a loss of spiritual faith.

As Paroline dictates, the Court first starts with Violet's claimed losses. Violet claims general losses in the amount of $794,118.35. This includes a cost range of $72,400.00 to $118,025.00 for future counseling costs

13

anticipated once she learns of the existence of the circulation of images of her sexual abuse; $647,807.00 in projected costs of increased medical care attributable to image exploitation and disaggregated from ordinary medical care; and out-of-pocket costs and expenses of $28,286.35 incurred relative to restitution documentation.

The Court now turns to the Paroline factors. The Court is as limited in its analysis of Violet as it was with Sarah. Violet's counsel submits that there have been 76 orders of restitution entered for Violet to date. However, counsel provided no further information about the amount of restitution in these orders. Also, the Court is unable to find any other case involving the "At School" series or a victim named Violet.

As with Sarah, there is no way to predict the number of future offenders likely to be caught, convicted and ordered to pay restitution. Moreover, there is no evidence on the issue of how may images of Violet Defendant possessed. Nevertheless, the knowledge that Defendant has seen even one image or video of Violet causes some measure of harm to her. Finally, and not unimportantly, there is no evidence that Defendant reproduced or distributed images of Violet[9] or that

---

[9] The Court notes that while Defendant was originally indicted on a count of distributing child pornography, that count was dismissed pursuant to his plea agreement, and there

he had any connection to the initial production of the images.

In sum, the Court is left only with a claimed loss of $794,118.35 by Defendant, 76 known defendants, and an unknown number of future offenders. Starting here, Violet's claimed loss amount of $794,118.35 divided by now 77 offenders = $10,313.23. The problem with this number, however, is it starts with a speculative loss. There is no evidence that Violet has suffered or will suffer the loss that the experts and her parents predict. The last estimation of Violet's well-being was offered by her parents and a clinical psychologist in 2016, and a forensic pediatrician in July 2017, before Defendant was even arrested. While the Court can accept the premise that Violet will have future loss related to the psychological harm that will be caused by learning of the extent of the continued distribution of her images, it cannot assume the estimated amount will be reached without more recent evidence. Accordingly, the Court will reduce the claimed loss by one-half as its starting point. With Violet's claimed loss amount of $323,903.50 divided by 77 offenders, the Court's starting point becomes $4,206.54. Discounting that amount for the number of future offenders, Defendant's limited role as an end user, and the lack of evidence on the

---

is no evidence of relevant conduct relating to this particular victim.

number of images involving Violet in this case, the Court will award Violet $2500.[10]

### 3. *Maureen*

Maureen is the middle sister of three sisters who were abused by the same unrelated man, who circulated their images and videos in what is known as the child pornography series entitled "Lighthouse." Maureen was repeatedly sexually molested as a child. The bulk of the images were created when Maureen was six or seven. Her abuse continued until she was eight years old. Her abuser purposefully took pictures and videos to "share" with others on the Internet. The images have been circulated for more than a decade. Maureen is no longer a minor but continues to suffer from the effects of the abuse. Through counsel, Maureen has requested restitution in the amount of $10,000. Maureen's request is accompanied by her own statement, the detailed forensic report of a clinical psychologist, dated January 25, 2018, and a letter from counsel regarding various estimations of Maureen's economic loss.

Maureen cannot remember a time when she did not know that other people were watching her abuse, when she was not afraid and ashamed, when she was able to sleep through the night, and when she was able to just be herself. In her teens, Maureen

---

[10]  Again, this is approximately a 40% discount.

used alcohol and marijuana to allay her anxiety. While she is now a mother and a wife in her early twenties, she can never feel secure in any situation. She fears that someone will recognize her and her past will be revealed to everyone around her. She is reclusive and unable to work. Maureen struggles to cope with the implications of knowing her images are being distributed to unknown numbers and identities and are being used for financial gain, trade of other child pornography, and even to normalize the adult-child sexual acts with vulnerable prospective child victims. One of the conclusions reached by the clinical psychologist follows: "Related to the psychological injuries proximately attributable to the knowledge of the downloading, trading, selling and viewing of the degrading images, superimposed upon her pre-existing vulnerabilities, Maureen is in need of medication, psychotherapy, and conjoint therapy." He opines that her injuries are "significant and permanent in nature, particularly given the indefinite nature of media exploitation involving her images."

As <u>Paroline</u> dictates, the Court first starts with Maureen's claimed losses. Maureen claims general losses extrapolated over the next five years to include medical and psychological treatment ($180,000.00), transportation to appointments ($20,000), medication ($10,000), childcare

($3,000), wage loss ($72,500), and costs and attorney's fees ($20,000). This totals $125,500.[11]

The Court now turns to the Paroline factors. The Court is even more limited in its analysis of Maureen's claims. While Maureen mentions in her victim impact statement that she has hundreds of notices from cases in which defendants had possessed her image, there is no evidence of how many prior restitution orders exist for Maureen.

As with Sarah and Violet, there is no way to predict the number of future offenders likely to be caught, convicted and ordered to pay restitution. Moreover, there is no evidence on the issue of how may images of Maureen Defendant possessed. Nevertheless, the knowledge that Defendant has seen even one image or video of Violet causes some measure of harm to her. Finally, and not unimportantly, there is no evidence that Defendant reproduced or distributed images of Maureen[12] or that he had any connection to the initial production of the images.

In sum, the Court is left only with a claimed loss of $125,000. Restitution for a "Lighthouse" series victim

---

[11] Counsel states that Maureen's losses will be in excess of $440,000 but fails to show how that number was derived.

[12] The Court notes that while Defendant was originally indicted on a count of distributing child pornography, that count was dismissed pursuant to his plea agreement, and there is no evidence of relevant conduct relating to this particular victim.

appears in only one district court case. In <u>United States v. Castro</u>, 2016 WL 8670503 (S.D.N.Y. Mar. 7, 2016), the victim sought $5000. Similar to this case, the Government in <u>Castro</u> provided no information concerning the first three <u>Paroline</u> factors and the remaining factors mitigated in favor of the defendant. The district court awarded $1000 in restitution, stating that said award was more in line with the Government's report of amounts awarded in other cases involving the same victim. The district court further stated that $1000 was neither a "token or nominal amount" as cautioned against by the <u>Paroline</u> Court. <u>Castro</u>, 2016 WL 8670503, at *2 (citing <u>Paroline</u>, 134 S. Ct. at 1727).

Upon the foregoing, and finding no reason to depart from the award amount previously given to a "Lighthouse" series victim, the Court awards $1000 in restitution to Maureen.

4. *Pia, Ava and Mya*

Pia, Ava and Mya are all victims of the "Sweet Sugar" series of child pornography images. The sexual abuse of these children was filmed when they were very young. Pia, the youngest, was only four years old. Ava and Mya were under the age of twelve. Their abuser purposefully took pictures and videos to "share" with others on the Internet. The girls are still minors. Through counsel, these victims request restitution in the amount of $5,000 each. Their request is accompanied by their mother's impact statement, a forensic

evaluation of Mya and Ava, and a declaration of counsel regarding attorney's fees and costs.

According to counsel, following the arrest of the children's abuser, they participated in counseling and seemed to be recovering. Years later, however, when they learned that their abuse images were being circulated among strangers, it "de-stabilized" the girls. The girls became very angry and lashed out at their mother in particular. They are embarrassed and afraid, uncertain how to protect themselves from unknown and unknowable dangers.

Their mother explains that her daughters feel helpless as their images get passed around from defendant to defendant. They have no words for their anguish, so they act out. She explains: "My daughters don't want to be defined as victims, but they cannot escape their victimization, and they can never put it in the past, because it is ongoing." She also points out the difficulty in putting her daughters through a forensic evaluation for the purpose of seeking restitution: "I resent that they have to be put through a further ordeal (of an evaluation) to show the court, and this person who has harmed them, just how badly they have each been hurt by those who look at their pain for pleasure." Their mother primarily seeks needed treatment for her daughters to be able to cope with the effects of the continuing circulation of their images. To that end, the forensic psychologist estimated the

cost of continuously treating the children together with vocational counseling and assessment and transportation costs to be $94,800.00 each.

As _Paroline_ dictates, the Court first starts with the victims' claimed losses. They claim a general loss of $94,800.00 each and $10,187.13 in out-of-pocket expenses for all three children collectively. Thus, the children submit losses in the amount of $98,195.71 each.[13]

The Court now turns to the _Paroline_ factors. The Court is very limited in its analysis of these children's claims. While counsel mentions that they have received restitution awards in other cases, no information is provided as to how many and in what amount. As with the other victims, there is no way to predict the number of future offenders likely to be caught, convicted and ordered to pay restitution. Moreover, there is no evidence on the issue of how may images of these children Defendant possessed. Nevertheless, the knowledge that Defendant has seen even one image or video of them causes some measure of harm. Finally, and not unimportantly, there is no evidence that Defendant reproduced or distributed images of these victims[14] or that he had any connection to the initial

---

[13] Counsel submits that Pia has received approximately $40,000 in restitution to date, while Mya and Ava have each received close to $10,000.

[14] The Court notes that while Defendant was originally indicted on a count of distributing child pornography, that

production of the images.

In sum, the Court is left only with a claimed loss of each child as stated above. Restitution for Ava appears in one other case as an agreed upon amount of $1500. See United States v. Reddick, 2018 WL 445112 (M.D. Ala. Jan. 16, 2018). As is the case with Maureen, the Government provided no information concerning the first three Paroline factors as they relate to these young victims, and the remaining factors mitigate in favor of Defendant. Thus, with very little to go on aside from sound discretion, this Court will award each of the three victims an award that is neither a token or nominal. Accordingly, the Court will award Mya, Ava, and Pia $1000 each.

### 5. Tara

There is very little information about Tara in the Court's record except a letter from the victim and her mother (even though Tara is no longer a minor). Tara has submitted a request for general losses in the total amount of $37,008.78.

Tara claims that from the time her images were published, she has been unable to live in her family home where the images were taken. She claims that she and her family have

---

count was dismissed pursuant to his plea agreement, and there is no evidence of relevant conduct relating to these particular victims.

been harassed. She also has received threatening messages through social media. She states: "I can never truly heal because the perpetrators and stalkers never allow me to do so." Tara's mother mentions that she is in weekly counseling.

A more detailed look at Tara's request for restitution is in order. She includes $6,872.38 in counseling sessions that took place from 2008-2010. She claims $2,318.40 in mileage related to those counseling sessions and another $800.00 in mileage for future counseling. Setting aside the fact that she has not submitted an expert report discussing her need for future counseling, she does not submit an estimate on that score. Instead, she seeks $2,688.00 for future insurance premiums.

Importantly, Tara submits that she claims that she has already been reimbursed in the amount of $18,872.38. Though there is no information about the source of that reimbursement, this amount more than covers the general losses mentioned above. Aside from that point, the losses occurred long before this Defendant was arrested so that causation cannot exist. Turning to the unreimbursed loss, the largest part of Tara's restitution request is $22,400.00 for "loss of home due to unsafe location (harassment towards victim) ($200/month since this loss of housing for me)." While Tara discusses harassment and being forced to move from her childhood home to live with others, she presents no evidence

of the timing of these losses. Because Tara's submission is dated March 31, 2017, it is difficult to connect the losses to this Defendant, who was not arrested until November 2017. More importantly, there is no evidence that Defendant's conduct included the type of harassment discussed in Tara's letter that forced her from her home.

In short, Tara has not established a causal link between her claimed unreimbursed loss and Defendant's conduct in receiving and possessing her image. Accordingly, the Court will not award restitution to Tara.

### III. Conclusion

Upon the foregoing, the Court hereby **ORDERS** Defendant Robert Anthony Moody to pay restitution in the amount of $3300 to Sarah; $2500 to Violet; $1000 to Maureen; and $1000 each to Pia, Mya and Ava. The Court will not award restitution to Tara. An Amended Judgment **SHALL** be entered to reflect the award of restitution.

**ORDER ENTERED** at Augusta, Georgia, this *15th* day of August, 2018.

J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA